IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>JUAN CARRANZA,<br><br>Defendants. | 8:19CR183<br><br>FINDINGS AND RECOMMENDATION |

This matter is before the Court on Defendant's Motion to Suppress (Filing No. 39). A hearing on the motion was held on August 6, 2019. A transcript of the proceedings was filed on August 13, 2019 (Filing No. 53). This matter is now ripe for disposition.

For the reasons explained below, the undersigned will recommend that the motion be denied.

**FACTS**

Jarrett Swearingen ("Agent Swearingen") testified at the evidentiary hearing held in this case. Agent Swearingen is a Special Agent with the United States Drug Enforcement Agency ("DEA"). (TR. 5.) Agent Swearingen has been with the DEA for approximately two-and-a-half years. (TR. 21.) Before joining the DEA, Agent Swearingen was with the Escambia County Sheriff's Office in Pensacola, Florida. (TR. 21.)

In February, 2019, investigators received information from a confidential source that Jose Miaranda-Funes ("Miaranda") was distributing methamphetamine in Omaha, Nebraska. (TR. 4.) Miaranda is the co-defendant in this case. On February 20, 2019, investigators, using a

confidential source, were able to introduce an undercover officer to Miaranda in order to purchase a pound of methamphetamine. (TR. 4.) At the time the undercover officer purchased the methamphetamine, investigators did not know where Miaranda was obtaining the drugs. (TR. 5.) Agent Swearingen testified that investigators suspected that Miaranda was obtaining the methamphetamine from a third-party because it is unusual for methamphetamine to be produced locally. (TR. 26-27.) Agent Swearingen testified that, based on his experience, a lot of methamphetamine comes from Mexico because it is difficult to get pseudoephedrine in the United States. (TR. 26-27.) Agent Swearingen testified that Miaranda was not arrested after the initial undercover purchase because investigators were trying to identify the source of Miaranda's supply. (TR. 26.)

On May 8, 2019, the confidential source informed investigators that he had driven Miaranda and Defendant to Motel 89 where the confidential source believed they obtained methamphetamine. (TR. 6.) The undercover officer contacted Miaranda on the evening of May 8, 2019 to purchase another pound of methamphetamine. (TR. 6; Ex. 1 and 2.) Miaranda told the undercover officer that he would have to "call his guy" and agreed to meet the undercover officer the next morning between 9:00 and 10:00 a.m. at the Family Fare in Omaha, Nebraska. (TR. 6-7; TR. 11; Ex. 2.) Agent Swearingen testified that he believed Miaranda's comment that he needed to "call his guy" meant that Miaranda did not actually possess the methamphetamine and would need to get it from someone else. (TR. 7.)

On the morning of May 9, 2019, investigators began surveilling Miaranda. (TR. 7.) Agent Swearingen was conducting surveillance outside of Miaranda's shop. (TR. 7.) Once investigators had surveillance in place, the undercover officer called Miaranda and told him that he was getting close to Omaha and would arrive in about ten minutes. (TR. 7; Ex. 2.) This call occurred at approximately 9:07 a.m. (TR. 7.) At around, 9:22 a.m., Miaranda left his shop and started heading towards the Family Fare. (TR. 7.) Once he left, Miaranda circled back through the neighborhood and went back to his shop. (TR. 8.) There, investigators observed Miaranda open the hood of his truck for a few minutes, and then leave his shop again. (TR. 8.)

Miaranda then traveled to Motel 89, which investigators had previously identified as Defendant's possible residence. (TR. 8.) Agent Swearingen testified that, based on what the confidential source told him and the undercover officer's telephone conversation with Miaranda

in which Miaranda referenced "his guy," he believed Miaranda went to Motel 89 to contact Defendant. (TR. 27-28.) Motel 89 is located a couple of miles from Miaranda's shop. (TR. 8.) When he got to Motel 89, Miaranda was not observed leaving his vehicle. (TR. 8.) Agent Swearingen testified that investigators did not have any information that Miaranda communicated with anyone at Motel 89. (TR. 24.) Miaranda stayed at Motel 89 for a couple minutes, and then drove to a QuikTrip located about a quarter-of-a-mile from where he was supposed to meet the undercover officer. (TR. 8-9.)

Miaranda arrived at the QuikTrip just after 10:00 a.m. (TR. 9-10.) Miaranda entered the QuikTrip for a few minutes, came out, and got back in his truck. (TR. 9.) Miaranda sat in his truck for a few more minutes, and then was observed moving the truck and getting gas. (TR. 9.) Once he finished putting gas in his truck, he got back in his truck and investigators observed him texting someone. (TR. 9.) Agent Swearingen testified that Miaranda's behavior suggested to investigators that Miaranda still did not have the drugs with him. (TR. 10.)

While he was at the QuikTrip, the undercover officer attempted to contact Miaranda by phone call and text message. (TR. 10.) The undercover officer's text messages to Miaranda told Miaranda to hurry-up and inquired how much longer it would be before Miaranda arrived at the Family Fare. (TR. 10.) Agent Swearingen testified that the purpose of these texts and calls was to determine whether Miaranda was coming to the Family Fare to deliver the methamphetamine. (TR. 10.) Miaranda responded to the undercover officer via text stating, "10, 15 Mi," which investigators interpreted as meaning that Miaranda would meet the undercover officer in ten to fifteen minutes. (TR. 11; TR. 20; Ex. 1) Agent Swearingen testified that investigators believed Miaranda was waiting for someone to bring him methamphetamine so he could complete the transaction with the undercover officer. (TR. 20.)

After approximately an hour, investigators observed an individual who was driving a silver vehicle contact Miaranda at the QuikTrip. (TR. 9-11.) Miaranda moved his truck closer to the road, parked it, and got into the silver vehicle. (TR. 11.) Investigators later identified Defendant as the driver of the silver vehicle. (TR. 11.) Miaranda and Defendant then drove to the Family Fare. (TR. 11.) Once they pulled into the Family Fare and parked, the undercover officer received a text message from Miaranda saying, "I'm here." (TR. 12; Ex. 1.)

3

Task Force Officer Vaughn ("Officer Vaughn") made contact with the silver vehicle at the Family Fare. (TR. 12.) All investigators involved, including Officer Vaughn, had been briefed on the operation. (TR. 12.) Officer Vaughn was present the entire time of the operation. (TR. 12.) Agent Swearingen testified that when Officer Vaughn approached the vehicle, Miaranda and Defendant were texting on their phones. (TR. 12.) Agent Swearingen stated that Officer Vaughn asked Miaranda to place his hands on the steering wheel and directed Defendant to place his hands on the dash of the vehicle. (TR. 12.) According to Agent Swearingen, Defendant was not compliant with Officer Vaughn's commands. (TR. 12.) Defendant continued to text on his phone and kept reaching around in the vehicle. (TR. 12.) Officer Vaughn then asked Miaranda and Defendant to exit the vehicle. (TR. 12.) Agent Swearingen initially testified that Miaranda and Defendant were detained at the time they exited the vehicle. (TR. 12.) Agent Swearingen testified on cross-examination that they were actually under arrest at that point. (TR. 25.)

The silver vehicle was then searched by officers. (TR. 13.) Officers did not seek consent to search.[1] (TR. 25.) One pound of methamphetamine was found inside the vehicle in a black, square case.[2] (TR. 13.) A smaller amount of methamphetamine was found on Defendant's person. (TR. 13.) Agent Swearingen testified that there were no drugs in plain view inside the vehicle. (TR. 25.)

## DISCUSSION

Defendant requests that all evidence obtained as a result of his arrest and the subsequent search of his person, car, and possessions be suppressed. Defendant argues that the evidence available to the officers did not provide probable cause for his arrest.

"[P]robable cause to arrest exists when an officer personally knows or has been reliably informed of sufficient facts to warrant his belief that a crime has been committed and that the person who is to be arrested committed it." *United States v. Luschen*, 614 F.2d 1164, 1171 (8th

---

[1] Defendant is not challenging the lawfulness of the search of the vehicle. He is only challenging the legality of his arrest.

[2] Agent Swearingen testified that he does not believe testing has revealed Defendant's fingerprints or DNA on the package. (TR. 26.) However, the Court notes there was no evidence presented that Miaranda was ever seen with this case prior to getting into Defendant's vehicle.

Cir. 1980). To determine whether an officer had probable cause to arrest, courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013). Probable cause is "determined by the totality of the circumstances—giving weight to the inferences police officers draw from their experiences." *United States v. Castro-Gaxiola*, 479 F.3d 579, 583 (8th Cir. 2007). "Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest." *Winarske*, 715 F.3d at 1067. However, "[m]ere presence' at the scene of a crime is not probable cause for a warrantless arrest." *Luschen*, 614 F.2d at 1171. Based on the facts of this case, the undersigned finds the officers had probable cause to arrest Defendant.[3]

In February, 2019, investigators, using a confidential source, introduced an undercover officer to Miaranda and purchased a pound of methamphetamine. On May 8, 2019, the confidential source informed investigators that he had gone with Defendant and Miaranda to Motel 89, where he believed they obtained methamphetamine. Later that day, an undercover officer contacted Miaranda in an effort to purchase more methamphetamine. Miaranda indicated he would have to contact "his guy," which suggested to investigators that Miaranda did not have drugs in his possession. However, Miaranda agreed to meet the undercover officer the next morning.

On the morning of May 9, 2019, investigators observed Miaranda go to Hotel 89. They then observed him travel to the QuikTrip, where he remained for approximately an hour. Investigators saw Miaranda get gas and text while he was at the QuikTrip, which again suggested to investigators that Miaranda did not have drugs in his possession. Defendant picked Miaranda up at the QuikTrip and then the two immediately proceeded to the Family Fare, where Miaranda had previously agreed to meet the undercover officer to sell him drugs. Based on the undercover officer's conversations with Miaranda, as well investigators' observations of Miaranda on the

---

[3] Agent Swearingen initially testified Defendant was detained when he was removed from the vehicle. On cross-examination, Agent Swearingen agreed with Defendant's attorney that Defendant was under arrest when he was taken out of the car. This was not clarified by the government on re-direct. Therefore, the Court is proceeding as if Defendant was arrested when he was removed from the vehicle.

morning of May 9, 2019, it was reasonable for investigators to believe that Defendant was Miaranda's supplier and involved in criminal activity. Ultimately, the drugs were located in a black, square case in the car Defendant had control of. This black case was never seen in Miaranda's possession. Defendant was not arrested for "mere presence" on the scene.

Defendant argues that the only evidence officers had to tie Defendant to any of Miaranda's activities was the word of a confidential source whose statements had not been corroborated. This argument is unpersuasive. The confidential source informed investigators that he went with Miaranda and Defendant to Motel 89 where he believed they obtained methamphetamine. When the undercover purchase was scheduled, investigators did not think Miaranda possessed methamphetamine. Based on Miaranda's comment that he needed to contact "his guy," investigators believed Miaranda needed to visit his supplier before the purchase. On the morning of the purchase, investigators witnessed Miaranda go to Motel 89, where investigators believed Defendant resided. The confidential source's reported belief that Miaranda previously obtained methamphetamine from Motel 89 was supported by Miaranda's behavior on the morning of the controlled buy, as well as Miaranda's previous statements to the undercover officer. *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013) ("An informant may . . . prove himself to be a reliable source for law enforcement by providing predictive information about a meeting time or place").

Moreover, even in the absence of information from the confidential source regarding Hotel 89, officers had probable cause to arrest Defendant. Miaranda previously supplied an undercover officer with a pound of methamphetamine. Investigators arranged for another controlled purchase in an effort to identify Miaranda's supplier. Miaranda agreed to meet the undercover officer the following day between 9:00 and 10:00 a.m. Based on Miaranda's statements to the undercover officer, investigators believed that Miaranda had to visit his supplier before the purchase. On the morning of the purchase, the undercover officer contacted Miaranda to let him know he was getting close to Omaha. Shortly after this call, Miaranda left his shop, circled around the neighborhood, and returned to his shop where he opened the hood of his truck. Miaranda next traveled to Hotel 89, and then to the QuikTrip where he remained for an hour. While at the QuikTrip, Miaranda engaged in behavior which suggested to investigators that he still did not possess the drugs. Once Miaranda was picked-up by Defendant, the two immediately proceeded to the Family Fare where

6

the drug transaction was to take place. Miaranda then texted the undercover officer to let him know that he had arrived at the Family Fare. The events leading up to the arrest, viewed from the perspective of a reasonable officer, amounted to probable cause.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert Rossiter that Defendant's Motion to Suppress (Filing No. 39) be denied.

Dated this 10th day of September, 2019.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

**ADMONITION**

A party may object to a magistrate judge's order by filing an objection within fourteen (14) days after being served with a copy of the findings and recommendation. Failure to timely object may constitute a waiver of any objection.